Philadelphia Marine Trade Assn. et al. v.
International Longshoremen's Association,
Local No. 1291, et al.

*Owen B. Rhoads* and *Robert G. Kelly*, for plaintiffs.
*Abraham E. Freedman*, for defendants.

KUN, P. J., April 21, 1954.—The bill filed in this case is for preliminary injunctive relief and for damages on final hearing. After the filing of the bill in this court, the proceedings were removed by petition of defendants to the United States district court which, however, on the same date remanded the case to this court because, as stated in the order of the United

States district court, it had no jurisdiction in the matter. The dispute arose out of a collective bargaining agreement and the incidents which will be referred to later. We issued a preliminary injunction, restraining further work stoppage by defendants. Because counsel at the hearing stated there were no authorities directly in point, we deemed it advisable to express our views herein, because of the novelty of the question.

The provisions of the Act of June 2, 1937, P. L. 1198, restricting the right of courts to issue labor injunctions, were amended by the Act of June 9, 1939, P. L. 302, to the effect that the restriction does not apply in any case involving a labor dispute "which is in disregard, breach, or violation of . . . a valid subsisting labor agreement arrived at between an employer and the representatives designated or selected by the employees for the purpose of collective bargaining . . .", etc.

Plaintiff, the Philadelphia Marine Trade Association, is the collective bargaining agent for the other plaintiffs, and the International Longshoremen's Association and its affiliate local unions, mentioned in the bill, are the collective bargaining agents for the deepsea longshoremen in and about the Port of Philadelphia, some of whom are named as parties defendant. On or about March 12, 1954, the collective bargaining agents for the respective parties named entered into a collective bargaining agreement which does not expire until September 30, 1955, and is now in full force and effect.

Paragraph 28 of the collective bargaining agreement provides, in effect, that all disputes and grievances of any kind or nature whatsoever arising under the terms and conditions of the agreement, and questions involving an interpretation of the agreement

shall be referred to a grievance committee. to consist of two members selected by the employer and two selected by the union, and on their failure to agree, "they shall immediately refer the matter to Rev. Dennis J. Comey, S.J., as Impartial Arbitrator. The Impartial Arbitrator shall have unlimited authority in resolving any issues submitted to him . . .".

Paragraph 33 of the agreement provides:

"It is agreed that a small joint sub-committee, representing the employers and the union, shall investigate the causes of and make recommendations *to prevent work stoppages.*" (Italics supplied.)

The present agreement between the parties is a continuation with modifications of prior agreements, under which the impartial arbitrator has made certain awards or rulings, containing in effect the same provisions relating to the appointment of the same impartial arbitrator.

Paragraph 13 of the agreement provides as follows:

"Bulk sugar vessels shall be manned and worked as set forth in the awards of the Reverend Dennis J. Comey, S.J., relating to bulk sugar vessels."

The awards of Reverend Comey relating to the manning and working of bulk sugar vessels, pertinent here, are as follows: The awards dated May 8, 1952: (1) "That longshore gangs which are hired to unload bulk raw sugar shall consist of 13 men, and shall be composed of one foreman, three control operators and one relief control operator and eight hold men"; (2) "that the eight hold men in said longshore gang may be shifted by the employer from hold to hold of a given vessel for the purposes of assisting in the discharge of bulk raw sugar from said holds"; and another dated May 7, 1953, in which the impartial arbitrator ruled that where an employer employs extra hold men in any longshore gang for the purpose of assisting in the

discharge of bulk raw sugar, the extra men so employed "may be shifted from hold to hold to the same extent the regular hold men may be shifted".

These awards or rulings were made by the impartial arbitrator after the disputed issues were referred to him and following a full and complete discussion and consideration of the contentions of the parties relating thereto.

The bill alleges and the evidence discloses that in connection with the discharge of a cargo from the vessel Hawaiian Fisherman, berthed at Pier 60, South Wharves, of the sugar company, on April 8, 1954, when the night gangs reported for duty at 7 p.m., representatives of the sugar company directed four hold men and three extra men of the no. 3 hatch gang, whose services were not then required in that hold, to assist in the discharge of cargo from no. 1 hold. These seven men from the no. 3 gang, contrary to the awards of the impartial arbitrator, and in violation of the collective bargaining agreement, refused to work in the no. 1 hold as directed, claiming that plaintiff employer had no right to "split-up" the gang, that work gangs had to be kept intact and not be shifted, although, as stated, the award of the impartial arbitrator specifically ruled that it could be done. This led to a complete stoppage of work by the longshoremen affiliated with defendant unions. There is no merit whatever in defendants' claim that plaintiffs did not come into court with clean hands, because as alleged they had not paid some of the defendants wages due them. What was due depended on the disposition of the underlying question as to whether plaintiffs had the right to shift the men at work, which right defendants deny, so that the question of what was due was bound up with the controversy and could not be separated therefrom.

The bill alleges and testimony was presented to the effect that there have been 29 such work stoppages by the longshoremen since January of 1951, alleged as part of a concerted plan and conspiracy on the part of defendants, individually and collectively, to force and require the sugar company to abrogate paragraphs 13, 28 and 33, and the awards of the impartial arbitrator, above referred to. This question cannot be resolved on the present hearing for a preliminary injunction.

It is clear that the underlying question as to whether or not there is a right on the part of the employer to shift its workmen from one place to another on a ship to do their work, is one which must be determined by the impartial arbitrator named by the parties as the forum to determine such an issue and any other issues in dispute arising under the contract, and we do not pass on the merits of that controversy. If, as contended, the impartial arbitrator has already ruled, as indicated, and he has made no modification of that ruling since, and defendants persist in violating the awards and rulings of the impartial arbitrator and cause work stoppage baselessly and in direct violation of the awards of the impartial arbitrator, such actions would lay a strong foundation for charging defendants with conspiracy to breach the contract and for damages. However, this is not presently before the court.

What we have been asked to do is to issue a preliminary injunction against the work stoppage by the longshoremen, members of defendant unions, and the question has been raised whether there is authority in the court to do so, inasmuch as there is no express and specific "no-strike" clause in the agreement. We had no difficulty in resolving this question in favor of plaintiffs, because of our views that where parties to an

agreement have provided for the appointment of a named impartial referee or arbitrator to resolve all disputes which may arise thereunder, and whose rulings shall be final, as is the case in the contract before us, the parties cannot take any other course to litigate or otherwise force a settlement of their dispute: Mack Manufacturing Corporation v. International Union, etc., 368 Pa. 37. There the converse situation was presented. The employer sought to restrain the arbitration proceedings provided for in the agreement. The court dismissed the bill saying that arbitration was the only remedy available. The case before us seeks to enjoin defendants' work stoppage as being a violation of their collective bargaining agreement under which all disputes must be settled by the selected impartial arbitrator. Here likewise arbitration is the only remedy of the parties, and they cannot resort to any other method of settling their dispute.

While the precise question has not been ruled upon as yet in any appellate court, so far as we have been advised, we find a closely analogous case in Kroger Co. v. General Teamsters' Union, et al., 77 D. & C. 301. The headnote of the case is somewhat misleading because it erroneously refers to a "no-strike" clause which actually is not in the case, there being no agreement present in so many words not to strike. However, in the "whereas" clause at the beginning of the agreement there is a statement that the parties were desirous of entering upon an agreement as to rates, etc., and "do away with the possibility of strikes, boycotts, lockouts and the like". The more important point in the case, however, was that the parties had agreed to submit all disputed questions which should arise to an arbitrator for decision. The court enjoined the continuation of the strike, holding that the parties were

bound by their agreement to settle their differences by arbitration and could resort to no other means to do so.

Defendants make too much of the point that there is no formal "no-strike" clause in their collective bargaining agreement. It is true that where there is no such clause, there is, generally speaking, the right to strike. The question here is whether there is such a right when there is present in the agreement such a provision as we have here for the appointment of an impartial arbitrator to settle all disputes, and the agreement also provides, in paragraph 33, supra, that representatives of the employers and of the union shall investigate the causes of and make recommendations "to prevent work stoppages". The question here does not turn on semantics. Under the Act of 1939, supra, the court has authority to issue an injunction in labor disputes where it is shown that the action threatened or complained of is "in disregard, breach or in violation of a valid subsisting labor agreement" etc., whether the precise descriptive term "no-strike" is used or not. The statute cannot be restricted as contended for by defendants. To do so would do violence to its plain terms. In a case such as this, in which the parties have agreed to submit their disputes to a named arbitrator for final decision, with the purpose plainly stated, "to prevent work stoppages", it would completely destroy the effectiveness of the agreement and the plain intendment thereof, if strikes or work stoppages would be permitted thereunder or, as stated in the Kroger case, supra, such construction would make the "arbitration purpose futile and practically surplusage".

This view of the matter has been taken by a number of arbitration officials. In In re Pan American Airways, Inc. and Transport Workers Union of America

(C.I.O.), 5 Labor Arbitration Reports (Dispute Settlements) 590, the arbitrators said:

"An agreement between a company and a union to arbitrate an issue constitutes a complete surrender of the company's right to determine the controversy by unilateral action and of both the company's and the union's right to test their contentions by a show of economic strength. In the field of industrial relations, arbitration is the substitution of reason for economic force and arbitrary action."

The permanent umpire under the contract between the Waterfront Employers Assn. of the Pacific Coast and the International Longshoremen's and Warehousemen's Union, C.I.O., was asked by both parties to issue rulings regarding the legality under the contract of an alleged lockout and an alleged strike which was in progress. He issued rulings that there was a strike and a lockout and ordered both parties to discontinue them: 9 L. A. R. 5. The permanent umpire stated:

"The document embodying the contract between the parties does not itself contain an express provision forbidding strikes, lockouts, or other work stoppages. However, contractual obligations to that effect exist by necessary implication from the arbitration provisions. The opening paragraph of the contract incorporates by reference the interpretations of arbitrators in awards rendered under the basic Award of the National Longshoremen's Board of 1934, and the agreements which have been in effect since that time. It is firmly established by a whole series of these Awards that in accepting the arbitration provisions the parties, by necessary implication, have agreed to forego economic action as a means for settling disputes arising during the term of the contract and in lieu thereof have agreed to refer all such disputes for settlement under the grievance procedure before re-

sorting to such action. With exceptions not pertinent to the immediate question raised by the Union's motion, the contract thus imposes upon the members of both organizations an obligation to refrain from attempts to enforce the contentions of either party in a dispute between them by resort to a work stoppage."

In Labor Disputes and Collective Bargaining, by Ludwig Teller, vol. 1, at page 3545, sec. 182, the following appears:

"Such a provision (conclusive arbitration clause) for arbitration of controversies in a collective bargaining contract contains an implied promise not to strike and use economic pressure to force agreement with labor's demands," citing the unreported California case, Shop-N-Save v. Retail Food Workers Union.

The court is in full agreement with the foregoing statements and ruling in the Kroger case, and since the work stoppage in the matter before us was in violation of the collective bargaining agreement between the parties, setting up an impartial arbitrator for the settlement of all their disputes, such violation was enjoinable under the Act of 1939.

As we have indicated above, it is not for us in its present stage of proceedings to pass judgment on the merits of the underlying controversy of whether an employer has the right to shift employes from one hold of a ship to another. We cannot avoid the observation, however, that it seems to us that this is a normal and natural right of an employer to have employes work at such places as would be most advantageous to him for the performance of the work involved. It is true in this case a fortiori, because it appears that the impartial arbitrator has so ruled when the precise issue was raised.

The preliminary injunction was properly granted.